In the Missouri Court of Appeals
 Eastern District
 WRIT DIVISION TWO

STATE OF MISSOURI ex rel. ) No. ED109351
KILROY WAS HERE, LLC, et al., )
 ) Writ of Mandamus
 Relators, )
 ) Circuit Court of the
 ) City of St. Louis
vs. ) Cause No. 1822-CC11663-01
 )
THE HONORABLE JOAN L. )
MORIARTY, CIRCUIT JUDGE, )
TWENTY-SECOND CIRCUIT COURT )
OF SAINT LOUIS MISSOURI, )
 )
 Respondent. ) Filed: August 31, 2021

James M. Dowd, P.J., Angela T. Quigless, J., and Robin Ransom, S.J.

 OPINION

 This discovery-related writ petition concerns the attorney-client privilege and work

product doctrine and requires our examination of (1) the nature of communications between an

attorney and a client that are within the scope of the representation, and therefore within the

attorney-client privilege, and those that are not, (2) the discoverability of attorney work product

and attorney mental impressions that are beyond the scope of the potential litigation for which

the attorney was retained, and (3) the treatment to be given to attorney-client communications

and attorney work product when those have strayed from the scope of the representation. We
entered a preliminary order in prohibition, and a timely answer and suggestions in opposition

were filed.

 The underlying litigation here is the latest episode in an unfortunate saga that began on

April 28, 2012, when a large tent, which Kilroy Was Here had installed for its bar patrons near

Busch Stadium in downtown St. Louis, came unmoored during a storm killing one and seriously

injuring seven others. After the victims filed a petition for damages alleging Kilroy was

negligent in connection with the set up and maintenance of the tent, they offered to settle for

$720,100 all claims against Kilroy and Kilroy’s insurer Starr Indemnity and Liability Company,

which was providing the defense through attorney Brian McBrearty.

 Two days later, Kilroy, through separate counsel, demanded that Starr settle the claims

for the amount the underlying plaintiffs had offered, which was within the $1 million policy

limits, and advised that the failure to do so would expose Starr to liability for bad faith refusal to

settle. As a result, on April 28, 2015, Starr retained attorney Keith Phoenix of the Sandberg,

Phoenix, and von Gontard law firm (SPvG) to advise Starr with respect to its potential liability

exposure for bad faith refusal to settle.

 On May 15, 2015, Starr, through Mr. Phoenix and on behalf of Kilroy, communicated its

rejection of the underlying plaintiffs’ settlement demand by making a counteroffer of

$249,999.99. No settlement was ultimately reached.

 According to the record before us, Mr. Phoenix’s involvement in the underlying case

commenced shortly after he was retained. On May 18, 2015, Starr’s claims diary noted that

“STARR made 250K offer per Mr. Phoenix.” Starr admitted that any offer to settle the

underlying case was made on behalf of its insured, Kilroy. Later in the litigation, Mr. Phoenix

 2
made multiple attempts on behalf of Kilroy to settle the case, including with opposing counsel

during trial.

 Around the same time, Phoenix also became involved in the factual and legal issues

pending in the case. For instance, he prepared a legal memorandum summarizing his legal

research relating to Kilroy’s “duty to monitor weather.” In addition, Phoenix assisted at Starr’s

request in preparing motions to be filed in the underlying case. On February 4, 2016, a Starr

representative emailed McBrearty and Phoenix requesting “monitoring counsel, Sandberg

Phoenix, ... review the motion [for summary judgment] and provide feedback before it’s filed.”

On February 9, 2016, a Starr employee emailed McBrearty certain case law Phoenix had

provided relevant to the summary judgment motion addressing the expectations of a prudent

person as to sudden weather changes. On February 29, 2016, Phoenix attended court for the

hearing on Kilroy’s motion for summary judgment.

 On March 1, 2016, Phoenix requested McBrearty update him on the scheduling of the

pretrial conference and on the status of the trial court’s ruling on the motion for summary

judgment. Phoenix was referred to as “monitoring counsel” and was kept updated on trial

preparation matters, including the preparation of witnesses and he was copied on emails

regarding trial strategy and witness testimony. Further, Phoenix reviewed the jury instructions

that McBrearty intended to submit to the court on behalf of Kilroy.

 The case proceeded to a jury trial in the Circuit Court of the City of St. Louis that

resulted in a March 14, 2016, verdict in favor of the underlying plaintiffs and against Kilroy in

 3
the total amount of $5.2 million.1 We affirmed the judgment entered on the verdict in Martinez

v. Kilroy Was Here LLC, 551 S.W.3d 491 (Mo. App. E.D. 2018).

 On April 5, 2016, the underlying plaintiffs and Kilroy entered into an assignment-of-

claims agreement under section 537.065,2 by which the underlying plaintiffs agreed to execute

on the judgment solely to the extent of Kilroy’s insurance coverage and to forgo execution

against Kilroy’s assets. In exchange, Kilroy partially assigned to the plaintiffs its claim against

Starr for bad faith refusal to settle.3

 The present lawsuit brought by the underlying plaintiffs and Kilroy (collectively

“Relators”) asserts claims for bad faith refusal to settle against Starr, and professional negligence

and breach of fiduciary duty against McBrearty. The parties have conducted written discovery

and deposed numerous witnesses including employees of Starr and Specialty Insurance Agency

(SIA), the third-party administrator that handled Starr’s day-to-day claims’ processing. Relators

have obtained those portions of Starr’s and SIA’s files relating to the underlying claims which

Starr has characterized as non-privileged. Other portions have been withheld pursuant to

relevancy and privilege objections.

 The dispute giving rise to this writ petition centers on a subpoena duces tecum directed to

SPvG which requests “[t]he entire file, including correspondence, billing records, and any other

documents, either received or generated, for the Kilroy litigation, or more specifically related to

1
 The amount was later reduced to $3.4 million after deducting as credits the amounts plaintiffs
received in settlement with other defendants.
2
 All statutory references are to the Revised Statutes of Missouri (2012).
3
 According to the agreement, the underlying plaintiffs are to receive in this case 100% of any
recovery up to the amount necessary to fully satisfy the judgment and 80% of any recovery in
excess of that amount with the remaining 20% to Kilroy.

 4
Martinez, et al., v. Kilroy was Here, LLC, 1222-CC02394.” The subpoena also requested

testimony relating to those matters.

 Starr objected and moved to quash arguing the subpoena sought documents and

information that were irrelevant and protected by the attorney-client privilege. The matter was

briefed and heard on April 26, 2020 and on September 4, 2020, the Honorable Respondent

sustained Starr’s objections and quashed the subpoena finding that Relators failed to demonstrate

any applicable exception or waiver of the attorney-client privilege.

 Relators then filed this writ petition arguing Respondent acted in excess of her authority

by granting Starr’s motion to quash because the ruling is based on an erroneous conclusion of

law. Relators assert the attorney-client privilege does not apply to the entire client file because

in multiple instances on this record, Phoenix’s conduct went beyond the scope of his

representation of Starr in that at times he acted as a claims adjuster and at other times acted as

Kilroy’s de facto co-counsel by participating in Kilroy’s defense in the underlying litigation.4

 We find that the documents and testimony sought by Relators from the SPvG law firm

may be discoverable to the extent: (1) Phoenix acted outside the scope of his representation of

Starr which was purportedly to assess Starr’s exposure for its alleged bad faith refusal to settle;

(2) Phoenix acted as de facto co-counsel along with McBrearty in Kilroy’s defense to the

underlying wrongful death and personal injury suit; (3) Phoenix participated in claims

adjustment activities or acted as a claims adjuster; and (4) that any other exception to the

attorney-client privilege applies such as communications made in the presence of a third party.

4
 We acknowledge that the subpoena at issue here was directed to Mr. Phoenix’s firm, SPvG.
Inasmuch as Mr. Phoenix acted on behalf of the law firm at all relevant times and we find no
legal distinction between the two for purposes of this opinion, we will employ Mr. Phoenix’s
name throughout for ease of understanding.

 5
 Therefore, consistent with the principles and holdings set forth in this opinion, we make

our preliminary order in prohibition permanent and remand this matter to the Respondent with

directions to conduct (or to assign such task to a special master appointed pursuant to Rule

68.01) an in camera review of all the documents responsive to the subpoena at issue which have

not already been produced with the purpose of determining which documents are discoverable

and which are not. Moreover, Respondent shall permit the deposition pursuant to the subpoena

duces tecum to proceed under the supervision of a special master with directions to likewise

apply the principles and holdings set forth in this opinion when ruling on objections to deposition

questions on the grounds of the attorney-client privilege or work product privilege.5

 Standard of Review

 A writ of prohibition is appropriate where the trial court lacks authority or acts in excess

of its authority. State ex rel. Cullen v. Harrell, 567 S.W.3d 633, 637 (Mo. banc 2019). “[I]f the

trial court’s discovery order is based on an erroneous conclusion of law, then the order is subject

to reversal.” State ex rel. Dewey & Leboeuf, LLP v. Crane, 332 S.W.3d 224, 231 (Mo. App.

W.D. 2010). Whether matters are privileged and therefore protected from discovery presents a

question of law. State ex rel. McBride v. Dalton, 834 S.W.2d 890, 891 (Mo. App. E.D. 1992).

 When the matters in dispute are neither work product nor privileged, mandamus is

appropriate to review a trial court’s sustention of objections to discovery because a trial court has

5
 “In evaluating the merits of the asserted privilege or any claim of waiver or undue hardship, the
trial court may order an in camera review of the disputed documents.” Westbrooke, 151 S.W.3d
at 368 (citing State ex rel. Lester E. Cox Med. Ctr. v. Keet, 678 S.W.2d 813, 815 (Mo. banc
1984); State ex rel. Friedman v. Provaznik, 668 S.W.2d 76, 80 (Mo. banc 1984)). An in camera
review of records sought in discovery that may contain privileged information is appropriate in
order to protect one who may be subjected to harm or humiliation upon unwarranted invasion by
another who is seeking information; the task may be undertaken by the trial judge or by a master
appointed for that purpose. State ex rel. Chance v. Sweeney, 70 S.W.3d 664 (Mo. App. S.D.
2002). See Rule 68.01.

 6
no discretion to deny discovery of matters which are relevant to the suit or are reasonably

calculated to lead to the discovery of admissible evidence. State ex rel. Swyers v. Romines, 858

S.W.2d 862, 863-64 (Mo. App. E.D. 1993).

 Discussion

1. General principles applicable to this writ petition.

 a. Rule 56.01

 Our analysis starts with the general rule of discovery: “Parties may obtain discovery

regarding any matter, not privileged, that is relevant to the subject matter involved in the pending

action...”. Rule 56.01(b)(1). And since here at least some of the discovery sought consists of

materials including documents, we also look to Rule 56.01(b)(3) which provides that “a party

may obtain discovery of documents and tangible things otherwise discoverable under Rule

56.01(b)(1) and prepared in anticipation of litigation or for trial by or for another party or by or

for that other party’s representative, including an attorney, consultant, surety, indemnitor,

insurer, or agent, only upon a showing that the party seeking discovery has substantial need of

the materials in the preparation of the case and that the adverse party is unable without undue

hardship to obtain the substantial equivalent of the materials by other means. In ordering

discovery of such materials when the required showing has been made, the court shall protect

against disclosure of the mental impressions, conclusions, opinions, or legal theories of an

attorney or other representative of a party concerning the litigation.”

 b. The attorney-client privilege and attorney work product.

 Confidential communications between an attorney and his client concerning the

representation of the client are protected by the attorney-client privilege. Diehl v. Fred Weber,

Inc., 309 S.W.3d 309, 323 (Mo. App. E.D. 2010) citing In re Marriage of Hershewe, 931 S.W.2d

 7
198, 202 (Mo. App. S.D. 1996). Privileged material is any professionally-oriented

communication between attorney and client regardless of whether it is made in anticipation of

litigation or for preparation for trial. Id. To be privileged, the communication must be made in

order to secure legal advice. State ex rel. Tillman v. Copeland, 271 S.W.3d 42, 45 (Mo. App.

S.D. 2008) citing St. Louis Little Rock Hosp., Inc. v. Gaertner, 682 S.W.2d 146, 150 (Mo. App.

E.D. 1984). Absent a waiver, such privileged communications are immune from discovery. Id.

 In contrast to Rule 56.01(b)(1)’s absolute immunity from discovery for privileged

material, Rule 56.01(b)(3) grants a qualified immunity for attorney work product. May Dep't

Stores Co. v. Ryan, 699 S.W.2d 134, 136 (Mo. App. E.D. 1985). Although privileged materials

do not have to be prepared in anticipation of litigation to qualify as privileged, in order for

materials to qualify as work product, they must be prepared in anticipation of litigation. State ex

rel. Tillman, at 45-56. The term “work product” includes two types of work product - “tangible

work product (consisting of trial preparation documents such as written statements, briefs, and

attorney memoranda) and intangible work product (consisting of an attorney’s mental

impressions, conclusions, opinions, and legal theories - sometimes called opinion work

product).” State ex rel. Atchison, Topeka & Santa Fe Ry. Co. v. O’Malley, 898 S.W.2d 550, 552

(Mo. banc 1995).

 Tangible work product may be discoverable if the party seeking discovery has shown a

substantial need for the materials in the preparation of its case and that the party is unable

without undue hardship to obtain the substantial equivalent of the materials by other means.

Rule 56.01(b)(3); O’Malley, 898 S.W.2d at 552. But Rule 56.01(b)(3) does not permit the

discovery of intangible work product even if the party seeking it has a substantial need for it.

O’Malley, 898 S.W.2d at 552–553. Moreover, Rule 56.01(b)(1) still excludes privileged

 8
material from discovery even if the requirements of the exception to the work product protection

are satisfied. May, 699 S.W.2d at 136–37. Attorney work product, both tangible and intangible,

also is privileged. Id. The trial court shall apply the work product doctrine to protect against the

disclosure of the mental impressions, conclusions, opinions, or legal theories, both tangible and

intangible, created or commissioned by counsel in preparation for possible litigation. Rule

56.01(b)(3); State ex rel. Ford Motor Co. v. Westbrooke, 151 S.W.3d 364, 367 (Mo. banc 2004);

O’Malley, 898 S.W.2d at 553, 555 n. 2.

 The party seeking discovery has the burden of establishing the relevance of the sought-

after materials. Rule 56.01(b)(1); Westbrooke, 151 S.W.3d at 367. If relevance has been

established or is uncontested and the opposing party asserts that a privilege precludes disclosure,

the opposing party bears the burden of showing the privilege applies. Westbrooke, 151 S.W.3d

at 367. To invoke the protection of the work product doctrine, the party opposing discovery

must establish, through competent evidence, that the materials sought to be protected are

documents or tangible things prepared in anticipation of litigation or for trial and were prepared

by or for a party or a representative of that party. Id.

 Blanket assertions of work product are insufficient to invoke protection. State ex rel.

Faith Hosp. v. Enright, 706 S.W.2d 852, 856 (Mo. banc 1986). In order to invoke work product

protection, the party opposing discovery “must establish, via competent evidence, that the

materials sought to be protected (1) are documents or tangible things, (2) were prepared in

anticipation of litigation or for trial, and (3) were prepared by or for a party or a representative of

that party.” Raytheon Aircraft Co. v. United States Army Corps of Eng’rs, 183 F.Supp.2d 1280,

1287–88 (D. Kan. 2001); see, e.g., O’Malley, 898 S.W.2d at 554 (party challenging privilege

must have “sufficient information to assess whether the claimed privilege is applicable”).

 9
“Competent evidence” may include a privilege log and affidavits from counsel. Westbrooke, 151

S.W.3d at 367 (quoting Rabushka ex rel. United States, 122 F.3d 559, 565 (8th Cir. 1997)). The

privilege log may identify documents individually or by categories if that provides sufficient

clarity for the court to rule on the asserted privilege claim. Id. at 368. Limited discovery by

deposition or otherwise regarding work product may be necessary. Id. Through this process, the

parties develop a factual record from which the trial court can render an informed decision. Id.

 c. Exceptions to the attorney-client privilege.

 Not all communications between an attorney and client are privileged. State v. Smith,

979 S.W.2d 215, 220 (Mo. App. S.D. 1998) (“[A] party may not claim the privilege where the

dealing and communication between a non-lawyer and a lawyer concern non-legal matters.”).

For example, “it is generally accepted that where the attorney acts as a collection agent, the

communications between him and his client are not protected by the privilege.” Cain, 383

S.W.3d at 120; see also State ex rel. Shelter Mut. Ins. Co. v. Wagner, 575 S.W.3d 476, 483 (Mo.

App. W.D. 2018) (recognizing when an “attorney acted as a claims adjuster, claims process

supervisor, or claims investigation monitor, and not as a legal advisor, the attorney-client

privilege would not apply.”).

 Moreover, a party cannot claim attorney-client privilege over communications when a

third person representing an adverse party was present. State Farm Mutual Auto Insurance Co.,

v. Allen, 744 S.W.2d 782, 787 (Mo. banc 1988). Additionally, “the great weight of authority on

the subject recognizes that with rare exception, the mere fact of the existence of a relationship

between an attorney and a client, and the nature of the fee arrangements between the attorney

and a client are not attorney-client privileged communications.” State ex rel. Koster v. Cain, 383

S.W.3d 105, 119 (Mo. App. W.D. 2012).

 10
 d. To warrant Rule 56.01 protection, the communication and work product

 must pertain to the subject matter of the representation.

 “The elements of attorney-client privilege are: (1) the existence of an attorney-client

relationship at the time the communication was made or advice was given; and (2) the attorney-

client relationship existed with respect to the subject matter of the communication or advice.”

State ex rel. Great American Insurance Co. v. Smith, 574 S.W.2d 379, 386-87 (Mo. 1978).

“[T]he determinative issue [is] whether the relationship of attorney and client existed between

the parties at the time of the communication with reference to the subject matter of the

communication.” Id.

2. The subject matter of Phoenix’s representation of Starr was Starr’s bad faith

 exposure to Kilroy.

 Inasmuch as Starr hired SPvG to provide legal advice with respect to Kilroy's potential

bad faith claim against Starr, a review of the elements and nature of such a claim will help define

the parameters and scope of SPvG’s representation. It is through this lens that Respondent upon

remand should evaluate each of SPvG’s actions and file contents at issue to determine whether it

was within the scope of its representation of Starr, and therefore retained its privileged character,

or not.

 a. Bad faith refusal to settle.

 A claim for bad faith refusal to settle will lie when a liability insurer: (1) reserves the

exclusive right to contest or settle any claim; (2) prohibits the insured from voluntarily assuming

any liability or settling any claims without consent; and (3) is guilty of fraud or bad faith in

refusing to settle a claim within the limits of the policy. Scottsdale Insurance Company v.

Addison Insurance Company, 448 S.W.3d 818, 827 (Mo. banc 2014). The first two elements do

 11
not appear to be at issue here. So, the third element - whether Starr was guilty of fraud or bad

faith in refusing to settle these claims within the policy limits - largely defines the scope of

SPvG’s representation of Starr in this case.

 The Missouri Supreme Court has described bad faith as “the intentional disregard of the

financial interest of [the] insured in the hope of escaping the responsibility imposed upon [the

insurer] by its policy.” Zumwalt v. Utilities Ins. Co., 228 S.W.2d 750, 754 (1950). The insurer’s

duty is to protect the insured’s financial interests, which are impacted by an insurer’s breach of

duty whether or not the breach results in an excess judgment. Scottsdale, 448 S.W.3d at 828

(emphasis added). An insurer’s obligation to act in good faith when settling a third-party claim

is part of what the insured pays for with its premiums. Truck Ins. Exch. v. Prairie Framing,

LLC, 162 S.W.3d 64, 93 (Mo. App. W.D. 2005). “When the insurer refuses to settle, the insured

loses the benefit of an important obligation owed by the insurer.” Id. An insurer “may be liable

over and above its policy limits if it acts in bad faith ... in refusing to settle the claim against its

insured within its policy limits when it has a chance to do so.” Landie v. Century Indemnity

Company, 390 S.W.2d 558, 563 (Mo. App. 1965) (emphasis added).

 In Johnson v. Allstate Ins. Co., 262 S.W.3d 655, 662 (Mo. App. W.D. 2008), the

court observed that “[c]ircumstances that indicate an insurer’s bad faith in refusing to settle

include the insurer’s not fully investigating and evaluating a third-party claimant’s injuries,

not recognizing the severity of a third-party claimant’s injuries and the probability that a

verdict would exceed policy limits, and refusing to consider a settlement offer.”

 12
3. Respondent's task upon remand is to determine to what extent the materials and

 topics encompassed by the subpoena along with Mr. Phoenix's actions,

 communications, and mental impressions exceeded the scope of his representation of

 Starr for its potential exposure for bad faith refusal to settle.

 According to the foregoing authorities, the critical point(s) in time for an insurer’s

liability exposure for the alleged bad faith refusal to settle is when the insurer “ha[d] a chance to

do so.” Landie, 390 S.W.2d at 563. On the limited record before us, the chance to settle on the

part of Starr appears to have occurred in April 2015.6 At that point, the plaintiffs had made their

demand to settle all claims, the wrongful death claim along with the seven personal injury

claims, for $720,100 which was within the $1 million policy limit. That figure was echoed two

days later when the personal attorney for Kilroy made an independent demand upon Starr to

settle the claim for the plaintiffs’ demand and also notified Starr that its failure to do so would

constitute the bad faith refusal to settle.

 While Starr and Kilroy remained in an insurer-insured relationship governed by the

policy pursuant to which Starr remained in charge of settlement and of the defense through Mr.

McBrearty, an adversarial aspect had crept into their relationship. It bears noting here that "an

insurer's duty to defend is distinct and different from its duty to settle a claim against its insured

within its policy limits when it has a chance to do so." Ganaway v. Shelter Mut. Ins. Co., 795

S.W.2d 554, 556 (Mo. App. S.D. 1990). In fact, in Missouri “an insurer, who is entrusted to

defend a claim on behalf of the insured, acts in a fiduciary capacity.” Pool v. Farm Bureau

Town & Country Ins. Co. of Missouri, 311 S.W.3d 895, 907 (Mo. App. S.D. 2010) (quoting

6
 There may have been subsequent points in time before or during trial when a settlement offer
from the underlying plaintiffs was on the table but our limited record does not make that clear.

 13
Grewell v. State Farm Mut. Auto. Ins. Co., 162 S.W.3d 503, 509 (Mo. App. W.D. 2005)). In the

situation where a third party is suing an insurer's policy holder, it is the insurance company's

control over the claim that creates a fiduciary relationship between insurer and insured. Id.

 So, Starr continued to provide and to control the defense through Mr. McBrearty and

retained its right to control settlement negotiations and ultimately whether settlement occurred.

But now that Kilroy had notified Starr that Kilroy believed that Starr’s failure to settle

established grounds for Kilroy to sue Starr for the bad faith refusal to settle in the event of an

excess verdict, Kilroy and Starr, at least in this context, were now in an adversarial posture. See,

e.g., State ex rel. Safeco Nat. Ins. Co. of America v. Rauch, 849 S.W.2d 632, 634 (Mo. App. E.D.

1993); Pool, 311 S.W.3d at 907.

 On April 28, 2015, in apparent recognition of this potential conflict, Starr retained Mr.

Phoenix “to provide advice and counsel. . . in connection with allegations of bad faith refusal to

settle the underlying lawsuit.” Starr and Phoenix assert that his role was later expanded to assess

coverage issues in the case as well. Understandably, Starr brought Mr. Phoenix in to advise it

with respect to the potential bad faith claim that was lurking in the event of an excess judgment.

And Phoenix owed Starr his undivided duty of loyalty. To carry out his duty, Starr was entitled

to have Mr. Phoenix become familiar with the facts of the case in order to advise Starr regarding

its bad faith exposure. Ideally, the retention of Mr. Phoenix would allow Starr to proceed on two

separate tracks. Through Mr. McBrearty, whose undivided loyalty was owed to Kilroy, Starr

could continue to fulfill its contractual duty to Kilroy to defend it in the underlying lawsuit. And

through Mr. Phoenix, it could receive advice with respect to its potential bad faith exposure.

 The record shows, however, that these two tracks converged.

 14
 a. Phoenix appears to have acted as Kilroy’s de facto co-counsel in the

 underlying litigation.

 On the record before us summarized above, Mr. Phoenix appears to have imbedded

himself as McBrearty’s co-counsel in Kilroy’s defense to the underlying lawsuit. Phoenix

extended settlement offers, attended motion hearings, provided legal research and local rule

information to lead counsel, participated in witness preparation, reviewed motions prior to filing,

negotiated settlement with opposing counsel, and reviewed jury instructions. The record

supports that while Phoenix was retained as bad faith counsel for Starr, he also acted with Starr’s

knowledge and favor in Kilroy’s legal defense.

 While there is nothing in our record that Kilroy and Phoenix formally entered into an

attorney-client relationship, “[a]n attorney-client relationship might be found to exist if there is

evidence to support findings that the ‘client’ sought and received legal advice and assistance and

the ‘attorney’ intended to undertake to give such advice and assistance on the ‘client’s’

behalf.” World Res., Ltd. v. Utterback, 943 S.W.2d 269, 270 (Mo. App. E.D. 1997).

 The convergence of these two tracks - what McBrearty was doing in defense of Kilroy,

and what Phoenix was attempting to do on behalf of Starr in connection with its bad faith

exposure - is troubling but not surprising because the interests of Kilroy and Starr might at times

have seemed to overlap. In other words, actions taken to defend Kilroy might also work to

Starr’s benefit in connection with its bad faith exposure. Certainly, a robust and successful

defense of Kilroy resulting in a defendant’s verdict, or at least a verdict within the policy limits,

would benefit both Kilroy and Starr. Kilroy’s assets would be unexposed and Starr's bad faith

exposure in the face of a verdict within the policy limits would logically be far less than if a

multi-million-dollar excess verdict resulted from the underlying litigation.

 15
 But, just because Kilroy's and Starr's interests might coincide on some level does not

justify obliterating the lines between Starr's defense of Kilroy in the underlying case and Starr's

own interests in connection with Kilroy’s potential bad faith case in which its interests and those

of Kilroy are definitely at odds.

 And we reiterate that while Phoenix was participating as de facto co-counsel of Kilroy,

his undivided loyalty belonged to Starr. Thus, it would appear that to the extent Phoenix was

acting as Kilroy’s lawyer, Kilroy should be entitled to the file generated in that connection

because “[t]he client’s files belong to the client, not to the attorney representing the client.”

McVeigh v. Fleming, 410 S.W.3d 287, 289 (Mo. App. E.D. 2013) (internal quotations omitted).7

Moreover, Kilroy should be entitled to know what Phoenix did on Kilroy’s behalf and why.

 Again, we entrust to Respondent or her designated special master upon remand to make

these determinations pursuant to the principles and holdings of this opinion.8

 Conclusion

 We conclude that Respondent erroneously quashed the subpoena at issue. The materials

and testimony sought by the subpoena are discoverable to the extent they relate to Mr. Phoenix’s

actions that were outside the scope of his representation of Starr as their bad faith counsel.

7
 “Privilege may also be waived when invoked in some fundamentally unfair way.” State ex rel.
St. John’s Reg’l Med. Ctr. v. Dally, 90 S.W.3d 209, 215 (Mo. App. S.D. 2002).
8
 Relators claim Phoenix acted as a claims adjuster. Relators rely on State ex rel. Shelter Mut.
Ins. Co. v. Wagner, where the court referenced the principle based on non-Missouri caselaw that,
“[t]o the extent that the attorney acted as a claims adjuster, claims process supervisor, or claims
investigation monitor, and not as a legal advisor, the attorney-client privilege would not apply.”
575 S.W.3d 476, 483 (Mo. App. W.D. 2018) (quoting Harper v. Auto Owner’s Ins. Co., 138
F.R.D. 655, 671 (S.D. Ind. 1991)). We observe that this limitation to the attorney-client
privilege contemplated in Wagner is little more than an application of the definition of the
attorney-client privilege, discussed at length herein. That is, the privilege does not apply to non-
legal communications or advice. State v. Hooper, 552 S.W.3d 123, 131 (Mo. App. S.D. 2018).
Upon remand, Respondent may be asked to reconsider Relators’ claims in this regard.

 16
Specifically, we find discoverable all materials and testimony to the extent that (1) Phoenix acted

as de facto co-counsel in Kilroy’s defense, (2) communications claimed to be privileged were

made in the presence of a third party, or (3) any other exception to the attorney-client privilege

applies.

 We therefore make our preliminary order in prohibition permanent. The Respondent,

Honorable Joan L. Moriarty, is directed to set aside her order granting the motion to quash

Relators’ subpoena duces tecum and to review the discoverability of any materials and testimony

sought by Relators’ subpoena, including but not limited to an in camera review, in accordance

with this opinion.

 _____________________________
 James M. Dowd, Presiding Judge

Angela T. Quigless, J., and
Robin Ransom, S.J., concur.

 17